**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**



FILED

OCT 27 2008

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**COLONNA'S SHIPYARD, INC.,**

        **Plaintiff,**

**v.**

**U.S.A.F. GENERAL HOYT S. VANDENBERG, her**
**tackle, engines, etc.** *in rem,*
**and**
**REEFMAKERS, LLC,** *in personam,*

        **Defendants,**

**W3 SHIPYARDS, LLC,**
**and**
**VENTURE DYNAMICS ENTERPRISES, INC.,**
**and**
**CANADIAN ARTIFICIAL REEF CONSULTANTS, INC.,**

        **Intervenor Plaintiffs,**

**v.**

**U.S.A.F. GENERAL HOYT S. VANDENBERG, her**
**tackle, engines, etc.** *in rem,*
**and**
**REEFMAKERS, LLC,** *in personam,*

        **Defendants.**

**Civil Action No. 2:08cv160**

## OPINION AND ORDER

    This matter is before the Court on: (1) motions of claimants, City of Key West, Florida

("Key West") and Branch Banking and Trust Company ("BB&T"), to dissolve the arrest of and

dismiss the *in rem* claims against the U.S.A.F. General Hoyt S. Vandenberg ("Vandenberg") for

lack of subject matter jurisdiction; and (2) motion of Plaintiff, Colonna's Shipyard, Inc.,

("Colonna's" or "Plaintiff"), for interlocutory sale of the Vandenberg.[1]  As to the first motion,

Colonna's filed a response in opposition, and Key West and BB&T failed to file rebuttal briefs.

As to the second motion, a response in opposition was never filed by any party or claimant in this

action.  On October 8, 2008, the Court held oral argument on these and other matters and further

permitted the filing of certain supplemental briefs.  For the reasons set forth herein, the Court

**DENIES** claimants' motions to dismiss and **GRANTS** Plaintiff's motion for the interlocutory

sale of the Vandenberg.

## I. Factual Background[2]

The City of Key West is the current owner of the Vandenberg, a former Navy vessel first

commissioned in the early 1940s.  Constructed as a steam powered vessel, the Vandenberg now

is indisputably an obsolete ship that was struck from the register of active Navy vessels more

than two decades ago.  Not only has the Vandenberg sat idle in the James River Ready Reserve

Fleet for many years, but it is now unable to navigate under its own power and it is not

commercially feasible to update the Vandenberg to do so.

The Vandenberg's obsolete status is illustrated by the fact that ownership of the ship was

recently transferred from the United States to the State of Florida, and subsequently to the City of

---

[1] There are two additional ripe motions before the Court, a motion for default judgment filed by Colonna's, and a motion to compel arbitration filed by Reefmakers, LLC.  The Court withholds ruling on these remaining motions because, at the request of the parties, this matter has been referred to a Magistrate Judge for a settlement conference.

[2] There does not appear to be any dispute about the material facts relevant to the instant motions.

Key West, as part of the "ships to reefs" program so that the Vandenberg could be transformed

into an artificial reef and sunk off the coast of Florida. 16 U.S.C. §§ 1220-1220d (2000). After

Key West obtained ownership through such program, it contracted with Artificial Reefs of the

Keys, Inc. ("Artificial Reefs of the Keys"), a non-profit corporation, to transform the ship into a

reef. Artificial Reefs of the Keys then entered into a contract with Reefmakers, LLC

("Reefmakers") who, in turn, entered into a subcontract with Colonna's Shipyard in Virginia.

Such subcontract is the subject of the instant lawsuit.

Pursuant to the subcontract between Reefmakers and Colonna's, the Vandenberg was

removed from the James River Reserve Fleet and towed to Colonna's Shipyard where it was

modified and repaired, certain components were removed, and the ship was readied for towing

from Virginia to Florida. According to Colonna's complaint, Colonna's completed the repairs as

required by the subcontract, but Reefmakers failed to pay the outstanding balance of

$1,639,457.97. Intervenor plaintiffs W3 Shipyards LLC ("W3 Shipyards"), Venture Dynamics

Enterprises, Inc. ("Venture Dynamics Enterprises"), and Canadian Artificial Reef Consultants,

Inc. ("Canadian Artificial Reef Consultants"), like Colonna's, all claim to be owed money from

Reefmakers for services associated with the modification and repair of the Vandenberg.

Although it is clear that even after repairs the Vandenberg will never again sail under its own

power, the Vandenberg is now capable of being towed from Virginia to Key West, Florida, a

distance of approximately 1,000 miles. During the voyage to Florida, the Vandenberg is to travel

across open water and a "riding crew" is to be on board during towing. Additionally, the

proposed sinking plan indicates that the Vandenberg will transport explosives from Florida to the

sinking site where it will be temporarily anchored for two to three weeks as final preparations are

made for sinking.

## II. Procedural Background

Colonna's instituted the instant breach of contract action against Reefmakers, *in personam*, and the Vandenberg, *in rem*, on April 3, 2008, based on Reefmakers' purported failure to pay Colonna's all that was due pursuant to the subcontract discussed above. On that same date, an order of arrest for the Vandenberg was signed by District Judge Walter D. Kelley, Jr. and an admiralty warrant was issued.[3] Pursuant to such warrant, the Marshal arrested the Vandenberg and maintained custody over the ship until an agreed order was entered transferring custody to Colonna's. On April 25, 2008, intervening complaints were filed by W3 Shipyards and Venture Dynamics Enterprises. On May 8, 2008, Colonna's complaint, along with a summons, was purportedly delivered to Reefmakers via certified mail at Reefmaker's Moorestown, New Jersey address. Reefmakers challenges the validity of the attempted service and has yet to file an answer, or seek leave of court to file a late answer, to Colonna's complaint.

On June 11, 2008, Colonna's filed a motion for interlocutory sale of the Vandenberg as security was not posted for the release of the ship during the two months following the ship's arrest. Five days later, on June 16, 2008, Key West filed a claim of owner for the Vandenberg and BB&T filed a claim of interest. On that same date, an intervening complaint was filed by intervening plaintiff Canadian Artificial Reef Consultants. On June 25, 2008, Reefmakers filed a motion to compel arbitration based on the arbitration clause contained in the subcontract. Two days later, Colonna's filed a motion for default judgment as to Reefmakers because Reefmakers

---

[3] Former United States District Judge Walter D. Kelley, Jr. presided over this case until he resigned his commission on May 16, 2008.

failed to file an answer or other responsive pleading.  On July 3, 2008, Key West and BB&T filed

motions to dissolve the arrest of the Vandenberg and to dismiss the *in rem* claims against it for

lack of subject matter jurisdiction.

On October 8, 2008, after the motions were ripe for decision, the Court conducted oral

argument, permitting all parties and claimants the opportunity to be heard.  The Court declined to

continue such hearing based on a purported conflict of interest regarding Key West's counsel's

representation of both Key West and BB&T as such conflict was identified to the Court only one

day prior to the scheduled hearing.  The Court did, however, afford any new counsel that was

retained by Key West or BB&T subsequent to the hearing two weeks to submit supplemental

memoranda commenting on the matters addressed at oral argument.  However, no such

memoranda were filed.

### III. Discussion – Motion to Dismiss

### A. Standard

When a federal court's subject-matter jurisdiction is challenged through a motion to

dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears the burden of

establishing jurisdiction. *The Piney Run Pres. Ass'n v. The County Comm'rs of Carroll County,*

*MD*, 523 F.3d 453, 459 (4th Cir. 2008).  A 12(b)(1) motion may either attack the complaint on its

face, contending that it fails to allege sufficient facts on which jurisdiction can be based, or it

may attack the truth of the jurisdictional allegations contained in the complaint. *Adams v. Bain,*

697 F.2d 1213, 1219 (4th Cir. 1982).  If the former procedure is followed, courts must construe

the facts in a light most favorable to the plaintiff, whereas if the latter procedure is followed,

courts may go beyond the pleadings and consider other evidence, including affidavits and live testimony, to determine if jurisdiction exists. *Id.* Here, Key West and BB&T do not challenge the veracity of the facts advanced by Colonna's, but contend that the largely undisputed facts establish that the Vandenberg is a non-maritime object falling outside this Court's admiralty jurisdiction. Accordingly, to the extent that any factual disputes exist, the Court will view the facts in the light most favorable to the Plaintiff.

### B. Admiralty and Maritime Jurisdiction

Federal courts have original and exclusive jurisdiction, over "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1); *see* U.S. Const. art. III, § 2, cl. 1 ("The judicial power shall extend to . . . all Cases of admiralty and maritime Jurisdiction."); *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 23 (2004) (citing the Constitution). A contract dispute falls within federal courts' admiralty jurisdiction if the subject matter of the contract is maritime. However, the Supreme Court has acknowledged some lack of clarity regarding such jurisdiction, stating: "Our cases do not draw clean lines between maritime and nonmaritime contracts." *Kirby*, 543 U.S. at 23; *see Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961) ("The boundaries of admiralty jurisdiction over contracts–as opposed to torts or crimes–being conceptual rather than spatial, have always been difficult to draw."). Notwithstanding some admitted confusion in defining which contracts are "maritime," federal courts have consistently held that "a contract to repair . . . a ship is maritime." *Kossick*, 365 U.S. at 735. Federal courts have likewise consistently held that contracts to build a ship or contracts involving work

6

performed on a non-maritime object, such as a "dead ship," are not maritime.[4]  *Id.*; *Hercules Co. v. The Brigadier General Absolom Baird*, 214 F.2d 66, 68 & n.1 (3d Cir. 1954).  Acknowledging such distinction, in *New Bedford Dry Dock Co. v. Purdy*, 258 U.S. 96 (1922), the Supreme Court declined to extend the rule, classifying new ship construction as non-maritime, to the *reconstruction* of vessels, finding that the word "repairs" is broad enough to include reconstruction.  *Id.* at 99-100.  The Court further indicated that any uncertainties that arise in distinguishing between repairs (maritime) and new construction (non-maritime) should be resolved in favor of admiralty jurisdiction.  *Id.*[5]

## C. Dead Ships

Although a contract to repair a "vessel" is indisputably maritime, there exists a classification of watercraft, labeled as "dead ships," over which federal courts have "no admiralty jurisdiction and for that reason there [can] be no maritime lien" on such watercraft.  *Hercules*, 214 F.2d at 68 & n.1; *see Amoco Oil v. M/V Montclair*, 766 F.2d 473, 477 (11th Cir. 1985) ("It is important to note that if a vessel is truly a 'dead ship' no maritime lien will attach since there

---

[4] Although courts and commentators have at times noted the disconnect between the rule that a contract to repair a ship is maritime, but a contract to build a ship is not, "the most important requirement of a jurisdictional rule is not that it appeal to common sense but that it be clear." *Tagliere v. Harrah's Illinois Corp.*, 445 F.3d 1012, 1013 (7th Cir. 2006).

[5] The Supreme Court recently stated in *Kirby* that "[t]o ascertain whether a contract is a maritime one" the courts cannot simply look to the place of formation or performance or whether a ship or vessel is involved, but "[i]nstead, the answer depends on the nature and character of the contract, and the true criterion is whether it has reference to maritime service or maritime transactions." *Kirby*, 543 U.S. at 23-24 (citations omitted).  Such description of the bounds of federal courts' admiralty jurisdiction does not alter the well established rule that vessel repair contracts are maritime because such contracts necessarily have a sufficient nexus with maritime service.

would be no admiralty jurisdiction."). "[D]ead ships or dead vessels represent a subcategory of nonvessels . . . [as] they are indisputably vessels for most of their useful life, but thereafter they assume the status of nonvessels." *In re McAllister Towing of Virginia, Inc.*, 2000 A.M.C. 2164, 2000 WL 1881197, at *2 (E.D. Va. July 11, 2000) (unpublished).

A key element in determining whether a watercraft that was indisputably a vessel at some point in the past is now a "dead ship" is whether such watercraft is *permanently* withdrawn from navigation. *Hercules*, 214 F.2d at 68; *see Goodman v. 1973 26 Foot Trojan Vessel*, 859 F.2d 71, 73 (8th Cir. 1988) ("Under the dead ship doctrine, a ship loses its status as a vessel when its function is so changed that it has no further navigation function."). As discussed in greater detail below, although the Supreme Court recently held that a ship's status as "in" or "out of" navigation no longer carries the weight it once had in determining a vessel's status, a ship *permanently* withdrawn from navigation remains a "dead ship" outside the admiralty jurisdiction of the federal courts. *Stewart v. Dutra Const. Co.*, 543 U.S. 481, 494 (2005).

The jurisdictional issue prompting Key West and BB&T to file the instant motions to dismiss centers on whether the Vandenberg, sitting idle in the reserve fleet for many years, was a "vessel" at the time Reefmakers and Colonna's entered into the subcontract. If the Vandenberg is deemed a "vessel," then the repair subcontract is clearly maritime, whereas if it is deemed a "dead ship," the subcontract for services to such non-maritime object falls outside of this Court's admiralty jurisdiction. *Compare Hercules*, 214 F.2d at 68 (finding that even though a ship "was not in commission" and unable to sail, the contract to repair it was maritime as "the efforts of everyone concerned were bent upon readying" such ship for voyage), *with Robert E. Blake Inc. v. Excel Envtl.*, 104 F.3d 1158, 1161 (9th Cir. 1997) (finding that a contract to repair a ship that sat

8

idle in the reserve fleet for several years "falls under the umbrella of the dead ship doctrine" and that the decision to reactivate the ship does not "breathe[] life into [such] dead ship"). In resolving this issue, this Court's analysis is driven by the Supreme Court's recent adoption of an expansive definition of the word "vessel" as used in general maritime law and codified at 1 U.S.C. § 3. *Stewart*, 543 U.S. at 497.[6]

As outlined in *Stewart*, the Vandenberg's status as a "vessel" turns on whether it is "practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment." *Id.* at 493. Although the Vandenberg's state of transit does not control, if the Vandenberg was permanently moored or permanently withdrawn from navigation at the time the subcontract was signed, then it likely qualifies as a "dead ship" since its use as a means of transportation on water became merely theoretical once *permanently* withdrawn. *Id.* at 494. As there is no controlling case law on point in this somewhat nebulous area of the law,[7] in drawing the distinction between a "vessel" and a "dead ship," this Court is mindful of the fact that for jurisprudential *and* commercial purposes, "the most important requirement of a jurisdictional rule is not that it appeal to common sense but that it be clear" so as to promote

---

[6] In determining whether the Vandenberg is a "vessel," this Court need not interpret or apply the statutory definition of vessel provided in 1 U.S.C. § 3. However, the statutory definition and cases applying it remain directly relevant since the Supreme Court recognized that the statutory definition mirrors the longstanding definition of "vessel" provided by general maritime law. *See Stewart*, 543 U.S. at 489-90 ("Section 3's definition has remained virtually unchanged from 1873 to present" and "merely codified the meaning that the term 'vessel' had acquired in general maritime law.") In fact, *Stewart* indicated that when applying § 3, courts are required to construe its definition "consistently with the general maritime law." *Id.* at 492.

[7] Although federal cases from outside the Fourth Circuit have discussed the "dead ship" doctrine in the context of a repair contract, movants fail to cite, nor is this Court aware of, any pre- or post-*Stewart* cases from the Fourth Circuit or the Supreme Court addressing whether a contract to repair a "dead ship" is within the maritime jurisdiction of the federal courts.

uniformity and avoid the unfortunate situation where "parties are not sure which court they

should be litigating their dispute in . . . ." *Tagliere v. Harrah's Illinois Corp.*, 445 F.3d 1012,

1013 (7th Cir. 2006); *see Long v. Sasser*, 91 F.3d 645, 647 (4th Cir. 1996) ("Jurisdictional rules

should above all be clear" as they are "meant to guide parties to their proper forums with a

minimum of fuss.").

Colonna's opposition to the pending motion to dismiss presents both substantive and

procedural arguments. Considering first the procedural challenge, that Key West lacks standing

to object to this Court's admiralty jurisdiction because it failed to timely file a verified claim,

such contention fails for two reasons. First, subject matter jurisdiction cannot be waived

expressly or impliedly by failing to follow a procedural rule or through any other means, as this

Court is a court of limited jurisdiction that "has a duty . . . to examine its jurisdiction sua sponte."

*Adams v. Allied Chem. Corp.*, 503 F. Supp. 253, 254 (E.D. Va. 1980); *see Flota Maritima*

*Browning de Cuba, Sociadad Anonima v. Snobl*, 363 F.2d 733, 735 n.4 (4th Cir. 1966)

("Unquestionably, . . . lack of jurisdiction over the subject matter may be raised at any time.").

Second, Colonna's contention that Key West failed to conform with the Supplemental Rules for

Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules")

*presupposes* that the Supplemental Rules apply to the adjudication of this matter. If, however, as

Key West posits, the Vandenberg is not a "vessel" and this Court lacks jurisdiction over the ship,

then the procedural requirements set forth in the Supplemental Rules would not apply to this

non-maritime matter. Accordingly, Colonna's procedural argument also fails because Key

West's method of proceeding is consistent with its theory of the case. However, Colonna's

substantive arguments regarding jurisdiction have merit and are discussed in detail below.

### D. Definition of "Vessel"

In *Stewart v. Dutra Construction*, the Supreme Court concluded that a large floating dredge with little ability to move on its own qualified as a "vessel" pursuant to 1 U.S.C. § 3, which sets forth the "established meaning [of the term vessel] in general maritime law." *Stewart*, 543 U.S. at 492, 497. The Supreme Court's opinion underscored the breadth of the definition of "vessel," which is defined as including "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. In attempting to illustrate which watercraft are "capable of being used," the Court indicated that ships "*permanently* moored" or ships "taken *permanently* out of the water" are no longer vessels "merely because of the *remote possibility* that they *may* one day sail again," as the permanence of their withdrawal renders them "practically incapable of transportation or movement." *Id.* at 494 (emphasis added). Although permanent withdrawal will prevent a ship from being deemed a vessel, a ship's "primary purpose or state of transit at a particular moment" does not control the ship's "vessel" status; rather, a watercraft need only be "used or capable of being used" as a means of transportation on water. *Id.* at 495, 497. In an effort to further elucidate the appropriate standard, the *Stewart* Court indicated that federal courts should determine whether a watercraft's capacity to engage in maritime transportation is "a practical possibility or merely a theoretical one." *Id.* at 496.

In order to synthesize the Court's analysis in *Stewart* with prior Supreme Court precedent, the *Stewart* opinion held that a ship may qualify as a vessel even if it is not "in navigation" at the relevant time, although, as discussed above, ships withdrawn from the water or from navigation for an extended period of time "*may* lose their character as vessels." *Id.* at 496 (emphasis added).

11

Because the "in navigation" test is merely one element relevant to the vessel calculus, rather than an independent requirement, prior case law from within and outside the Fourth Circuit finding that ships "withdrawn from navigation" are "dead ships" no longer carries the weight it once had. *See, e.g., Noel v. Isbrandtsen Co.*, 287 F.2d 783 (4th Cir. 1961). Exploring the post-*Stewart* legal landscape, the parties do not cite, and this Court is not aware of, any cases endeavoring to determine if a Ready Reserve Fleet ship sitting idle for many years is a "dead ship" outside of federal maritime jurisdiction. Likewise, the parties do not cite, nor is the Court aware of, any post-*Stewart* cases addressing the timing of when a ship, previously moored for an extended period of time but thereafter undergoing repairs pursuant to a repair contract, is "reborn" such that it once again qualifies as a "vessel."[8] It is, however, clear from the Supreme Court's opinion in *Stewart* that such rebirth is possible, as the Court expressly acknowledged that "[a] ship long lodged in a drydock or shipyard can again be put to sea, no less than one permanently moored to shore or the ocean floor can be cut loose and made to sail." *Stewart*, 543 U.S. at 496. As to what is necessary for such rebirth to occur, *Stewart* makes clear that the dispositive question in every case is whether a ship's use as a means of transportation on water is "a practical possibility or merely a theoretical one." *Id.*

---

[8] In *Cain v. Transocean*, 518 F.3d 295 (8th Cir. 2008), a divided panel of the Eighth Circuit recently held that, post-*Stewart*, an *incomplete ship under construction* remains a non-vessel even if construction has progressed far enough such that the ship is practically capable of transportation. The *Cain* opinion does not, however, address the dead ship doctrine or repair contracts to ships that were at one time indisputably "vessels," and instead relies heavily on the "historical perspective that vessels under construction are treated differently from completed vessels." *Id.* at 301.

## E. Effect of Repair Contract on "Vessel" Status

At the heart of the issue before this Court is the question of whether a repair contract aimed at returning an obsolete ship to navigation is sufficient to "breathe life" back into the watercraft and reinstate its status as a "vessel." Although several circuit court opinions have suggested that a shipowner's subjective intent regarding future use of a watercraft impacts a ship's "vessel" status, this Court finds that the rule dictated by *Stewart* is that the owner's intent is irrelevant to the calculus. *Compare De La Rosa v. St. Charles Gaming Co.*, 474 F.3d 185, 187 (5th Cir. 2006) (considering as part of the calculus the defendants' "intent is to use [the ship] solely as an indefinitely moored floating casino"), *and Tagliere*, 445 F.3d at 1016 (drawing a distinction between "permanently" and "indefinitely" moored vessels for the purposes of the jurisdictional calculus and indicating that the outcome may turn on whether the owner "intends that the boat will never again sail . . . [or whether] he has not yet decided its ultimate destiny"), *with Bd. of Comm'rs of Orleans Levee Dist. v. M/V Belle of Orleans*, 535 F.3d 1299, 1311-12 (11th Cir. 2008) (rejecting any test for vessel status that relies on the owner's intentions), *and Robert E. Blake*, 104 F.3d at 1161 ("[T]he mere decision to reactivate is insufficient to confer admiralty jurisdiction . . . ."). As explained by the Eleventh Circuit in *Belle of Orleans*, vessel status cannot turn on a shipowner's subjective intentions as such a test is "incompatible with the Supreme Court's focus on providing uniformity within admiralty jurisdiction." *Belle of Orleans*, 535 F.3d. at 1311. Furthermore, a subjective test conflicts with *Stewart's* finding that vessel status turns on whether a ship is "practically capable of maritime transportation, *regardless of its primary purpose* . . . ," since intentions regarding a ship's use are analogous to the ship's "purpose." *Id.* (quoting *Stewart*, 543 U.S. at 497) (emphasis added); *see also In re Queen Ltd.*,

13

361 F. Supp. 1009, 1013 (E.D. Pa. 1973) (rejecting a test where the existence of a maritime lien "depend[s] on the ethereal quality of the owners' intent to use the ship in commerce and navigation" in favor of a test addressing the "degree of permanence of the attachment of the structure to the land").[9]  A standard devoid of the need to ascertain intent is more likely to lead to predictable and settled commercial expectations because it relies on *objective* criteria. Accordingly, the Vandenberg's vessel status turns not on the intent of the United States or Key West, but rather, whether objective facts establish that the ship is "practically capable" of maritime transportation.

In determining *when* a former vessel long withdrawn from navigation again becomes a vessel, there are two possible outcomes: one, that the ship does not again become a vessel until after it is repaired and launched on a voyage; or two, that the signing of a contract to repair and reactivate the ship is enough to reestablish its vessel status.  Adopting the first result, in *Robert E. Blake*, the Ninth Circuit held that a contract to reactivate a ship in the United States Ready Reserve Fleet was insufficient to reestablish the ship's vessel status. *Robert E. Blake*, 104 F.3d at 1161. Adopting the second result, in *Hercules*, the Third Circuit concluded that a ship was not "withdrawn from maritime commerce and navigation" at the time that repairs were commenced because "the efforts of everyone concerned were bent upon readying her for a sealing voyage"

---

[9] Owner's intentions are not only virtually impossible to measure but they "may change in ways never anticipated." *Belle of Orleans*, 535 F.3d. at 1312. In *Luna v. Star of India*, 356 F. Supp. 59 (S.D. Cal. 1973), the Star of India, a museum ship moored in San Diego, was deemed a "vessel" for jurisdictional purposes by the Southern District of California even though the owner claimed the ship to be "permanently moored" and indicated that the ship "was not intended to be used in the future as anything more than a floating museum." *Id.* at 60. Just three years after the district court's ruling, "the Star of India was put to sea for the first time in fifty years, and she continues to sail annually." *Belle of Orleans*, 535 F.3d. at 1312.

and such efforts are "a sufficient devotion to maritime commerce to make her a vessel." *Hercules*, 214 F.2d at 69. The Third Circuit further clarified that "[s]he need not actually hoist anchor on beginning that voyage to become a vessel." *Id.*[10] Similarly, in *Buck Kreihs Co. v. United States*, 427 F.2d 770 (Ct. Cl. 1970), the Court of Claims held that a repair contract to return three mothballed vessels, that were "totally unfit for navigation," to active use was a maritime contract over which federal district courts have exclusive jurisdiction. *Id.* at 774, 777. Relying heavily on *Hercules*, the court concluded that "a floating structure that was always dedicated as a vessel would remain or resume status as a vessel, not a 'dead' ship, during a period of restoration and repair for new voyages, any degree of dilapidation notwithstanding." *Id.* at 777.

Although this Court agrees with the portion of the analysis in *Blake* concluding that the "mere decision" to reactivate a ship, which can occur entirely within an owner's mind, is not enough to transform a dead ship back into a "vessel," the Third Circuit's analysis in *Hercules* is ultimately more compelling. *Blake*, although factually similar to the instant matter, is unpersuasive for two reasons. First and foremost, *Blake*, decided prior to the Supreme Court's

---

[10] The Ninth Circuit in *Blake* summarily distinguished *Hercules* by finding that the pertinent analysis was merely dicta because the Third Circuit indicated that the vessel was never withdrawn from navigation. *Blake*, 104 F.3d at 1162. Such a reading, however, mischaracterizes *Hercules*, as the Third Circuit did not conclude that the ship was *never* withdrawn from navigation, but rather, indicated that *at the time the repairs commenced* the ship was not deemed "withdrawn from navigation" because it was being repaired for a voyage. *Hercules*, 214 F.2d at 69. Similarly, here, this Court need not reach the question of whether the Vandenberg was previously a "dead ship," as *even if it was*, the changed circumstances involving its transfer of ownership and execution of repair contracts breathed life back into the vessel. *See Hercules*, 214 F.2d at 69 ("If the [ship] ever was withdrawn from navigation and maritime commerce, she was returned to those pursuits when her owners and would-be owners began putting her in shape for an intended voyage . . . .").

decision in *Stewart*, puts too much emphasis on the fact that a long-moored ship in need of repairs remains physically out of navigation during the repair period. *See Robert E. Blake*, 104 F.3d at 1161 ("[T]he mere decision to reactivate is insufficient to confer admiralty jurisdiction because the ship at that time is *still inoperable and thus still withdrawn from navigation*.") (emphasis added). *Stewart* makes clear that such focus is misplaced as the key inquiry must address the practicality of a watercraft being used for maritime transportation, not its present state of transportation or present primary use. Second, *Blake* misses the point by relying on several cases involving wharfage contracts for dead ships in support of the proposition that contracts for services to dead ships are not maritime. Such reliance is misplaced because the wharfage contracts in such cases had no bearing on whether the ships in question would ever sail again, whereas a repair contract demonstrates the practicality of a vessel again being used in maritime transportation. *See Robert E. Blake*, 104 F.3d at 1161 (citing cases).

Accordingly, when affirmative steps that can be objectively measured establish that a long-moored ship will once again be used to transport persons or goods on water, *Stewart* requires that such ship be deemed a "vessel." Such finding is mandated because once an individual or entity is contractually bound to repair a ship, it is no longer "merely a theoretical possibility" that the ship will again be used as a means of transportation on water. On the contrary, the contract evidences the practicality of such event. *Stewart*, 543 U.S. at 496. If an operable vessel "dies" not because it no longer floats or no longer has working engines but instead because it can be labeled "permanently" moored or "permanently" withdrawn from commerce, then such ship must "live" again once events that can be objectively measured disprove the "permanence" of such mooring or removal. *See Buck Kreihs*, 427 F.2d at 777 ("[I]f

16

a laid-up ship is ever to be deemed withdrawn from trade or commerce the return to it takes place at the beginning and not at the end of a period of restoration or repair.").

Here, applying the standard articulated in *Stewart*, at the time the subcontract between Reefmakers and Colonna's was signed, the Vandenberg was a watercraft "practically capable of maritime transportation . . . ." *Id.* at 497. True, in the past, the Vandenberg sat idle for many years, had little future prospects, was at some point plainly "withdrawn from navigation" and arguably met *Stewart's* newly articulated standard that its use as a means of transportation on water was "merely a theoretical one."[11] *Id.* at 496. However, the Vandenberg's fate changed when it was designated for use as an artificial reef, its ownership transferred to the State of Florida and subsequently Key West, and several contracts were signed between the owner, contractors, and subcontractors to repair and convert the Vandenberg. Although movants contend that both the Vandenberg's condition and its period outside of service indicate that it is no longer a vessel, the repair contracts conclusively demonstrate the "practicality" of the vessel again being used as a means of transportation on water.[12] Such practicality is further illustrated

---

[11] While in mothballs and with no prospects of future use, a ship that has the ability to transport goods or persons on water, but is unlikely to do so, *might* be deemed permanently withdrawn from commerce and therefore a dead ship outside of maritime jurisdiction. On the other hand, the fact that *Ready* Reserve Fleet ships are being *preserved* by the United States and can be reactivated if needed suggests that they *might yet* be vessels, even while in an idle state. *See Buck Kreihs*, 427 F.2d at 777 (indicating that nothing in the case suggested that the reserve fleet ships were "laid up for any reason other than to preserve them for future maritime needs"; such ships surely "were not being held for a rise in the scrap metal market"). Here, however, the Court need not reach the question of whether, post-*Stewart*, a reserve fleet ship long moored in a river *with no change in circumstances* is a "dead ship" outside of this Court's jurisdiction, or a "vessel" within it, as objective facts indicate that the Vandenberg's circumstances changed and that it is "practically capable" of maritime transportation.

[12] Movants submit an affidavit indicating that to repair the Vandenberg to an operational state would cost at least two million dollars. (Memo in Support Mo. to Dismiss, Ex. E.)

17

by the fact that, pursuant to the subcontract, and prior to repairs commencing at Colonna's

shipyard, the Vandenberg was towed *on water* from the James River Reserve Fleet to Colonna's.

*See Advance Welding Co. v. M/V Corra D*, 299 F. Supp. 736 (D.C. La. 1969) ("The fact that the

[ship] was towed to the plaintiff's shipyard in Venice, Louisiana, proves that it was capable of

navigation while under tow and therefore remained a vessel."). After undergoing repairs, the

Vandenberg is now ready for a much longer voyage from Virginia to Florida, during which it will

carry a riding crew *on water*. Additionally, after reaching Florida, it will transport explosives to

the sinking site. Even though the trip to Florida would apparently be the Vandenberg's final

voyage, the subcontract was nevertheless a repair contract to ready the ship to transport a crew

approximately 1,000 miles on water.

In considering whether the repair subcontract breathes life back into the Vandenberg, this

Court has the same hesitancy to extend the scope of the dead ship doctrine as the Third Circuit

had in *Hercules* and the Supreme Court had in *New Bedford. Hercules*, 214 F.2d at 69; *New

Bedford*, 258 U.S. at 99-100. Accordingly, the Court declines to draw a distinction between a

repair contract, a reconstruction contract, and a contract to repair/reconstruct a ship for a final

voyage. Furthermore, even if this Court had doubts regarding whether it reached the proper

result in concluding that admiralty jurisdiction extends to the subcontract at issue, the Supreme

---

Although potentially prohibitive repair costs may be relevant to the status of a ship in a scenario where a repair contract has yet to be signed, here, the cost is irrelevant because the executed contracts between Key West and Artificial Reefs of the Keys, Artificial Reefs of the Keys and Reefmakers, and Reefmakers and Colonna's, conclusively establish the practicality of the repairs to prepare the Vandenberg to carry a "riding crew" from Virginia to Florida. Regardless of whether movant's expert labels repair costs as "high," the Court cannot label the repairs as impractical if willing parties entered into contracts to repair a ship to a state where it will transport goods or persons on water, if only under tow.

Court has expressly instructed that any uncertainty, regarding whether a contract to fix a ship is deemed a repair contract within the federal courts' admiralty jurisdiction, should be resolved in favor of jurisdiction. *New Bedford*, 258 U.S. at 99-100; *see also Wells v. Liddy*, 186 F.3d 505, 524-25 (4th Cir. 1999) (explaining that the "foremost goal" of maritime law is uniformity; thus, "[m]aritime law traditionally resists doctrinal change that might balkanize its uniformity and generality") (citations omitted). Accordingly, the Vandenberg is properly characterized as a "vessel" within this Court's admiralty jurisdiction and the subcontract at issue, being a repair contract for a vessel, is likewise within the Court's jurisdiction. This finding comports with the Fourth Circuit's instruction that "[j]urisdictional rules should above all be clear," *Long*, 91 F.3d at 647, because it offers the clear rule that contracts to repair a long-moored ship and ready it for use as a means of transportation on water are within this Court's admiralty jurisdiction.

### F. Prior Seaworthiness Precedent

As discussed above, the parties fail to cite, and this Court is unaware of, any *controlling* precedent, decided before or after *Stewart*, that reaches the question of whether this Court has maritime jurisdiction over a repair contract touching a reserve fleet ship. The closest controlling cases relied on by movants are seaworthiness opinions from the Fourth Circuit and the Supreme Court. However, such cases are ultimately unpersuasive as none of the cases discussed admiralty jurisdiction or the definition of "vessel," none involved repair contracts, and all were decided prior to *Stewart* and focused primarily on whether the ships, repeatedly referred to as "vessels" by both the Fourth Circuit and Supreme Court, were "in navigation."[13]

---

[13] Both the Supreme Court and the Fourth Circuit repeatedly refer to the ships in the seaworthiness cases both as "vessels" and "dead" ships. *See Noel*, 287 F.2d at 785 (calling the

The key seaworthiness cases were all decided within a few years of each other and all nearly half a century ago. First, in *West v. United States*, 361 U.S. 118 (1959), the Supreme Court held that a warranty of seaworthiness did not attach to a ship that was towed to a shipyard to undergo "major repairs and renovations" to make her seaworthy. *Id.* at 122. Such warranty did not attach because the very reason for the repairs was to make the ship seaworthy and, prior to the completion of repairs, "[i]t would be an unfair contradiction to say that the owner *held the vessel out as seaworthy . . .* " *Id.* (emphasis added). Relying on *West*, in *Roper v. United States,* 282 F.2d 413 (4th Cir. 1960), the Fourth Circuit held that no warranty of seaworthiness applied to a reserve fleet ship being temporarily used to store grain as "[i]t is now settled that a deactivated vessel in one of the 'moth ball' fleets is, *for these purposes*, dead and withdrawn from navigation, so that there is no warranty of her seaworthiness." *Id.* at 416 (emphasis added). Curiously, the ship in *Roper* did actually transport grain on water but, pre-*Stewart*, the district court and the Fourth Circuit concluded that, on the facts before it, such use did not amount to the ship being *in navigation. Id. Roper* was thereafter affirmed by the Supreme Court which concluded that *on the facts before the Court*, including the fact that the ship did not undergo repairs prior to being "utilized as a granary or warehouse," it could not be said that the ship "had been converted into a vessel in navigation." *Roper v. United States,* 368 U.S. 20, 22-23 (1961)

---

ship at issue a "vessel" out of navigation and also a "dead ship"); *Roper v. United States,* 282 F.2d 413, 416 (4th Cir. 1960) (indicating that a "deactivated vessel" in the mothball fleet is "dead and withdrawn from navigation" for the purposes of the warranty of seaworthiness); *Roper v. United States*, 368 U.S. 20, 22 (1961) (hereinafter *Roper II*) (indicating that the ship was part of the "dead fleet" comprised of "some 360 vessels"); *see also West v. United States*, 361 U.S. 118, 121-22 (1959) (finding no warranty of seaworthiness but calling the ship "the vessel" numerous times). Such use of the term "vessel" is curious if these cases were meant to stand for the proposition that the court lacked jurisdiction over such watercraft, as the term "vessel" has had a consistent definition in general maritime law since the late 1800s.

(hereinafter *Roper II*). As the Supreme Court was "unwilling to upset the trial court's factual determination that the [ship] was not a vessel in navigation" because such finding was not "clearly erroneous," the Court found that no warranty of seaworthiness applied. *Id.* at 23-24.[14] Finally, in *Noel*, the Fourth Circuit, again relying on *West,* concluded that the warranty of seaworthiness did not apply to a ship undergoing work to *deactivate* it and return it to the mothball fleet. *Noel*, 287 F.2d 785. In each of these cases, the court concluded *not that it lacked jurisdiction*, but that there was no warranty of seaworthiness because the ship at issue was not "in navigation" and did not represent itself as having operable equipment.

After scrutinizing the analysis in *West, Noel, Roper,* and *Roper II,* this Court concludes that such opinions do not alter the analysis dictated by *Stewart* and illustrated by *Hercules* and *Buck Kreihs*. As discussed above, the seaworthiness cases not only involve an entirely different question of law than addressed here, they are distinguishable factually as none involved contracts to repair a vessel. Unlike the jurisdictional question of whether a watercraft is a "vessel," a question that must be answered objectively without regard to the ship's primary use or the owner's intended use, the warranty of seaworthiness is an "implied warranty that the vessel is

---

[14] *Roper II* and associated seaworthiness cases must now be read in light of *Stewart's* clarification that the true test for vessel status in *all* cases is whether a ship is *practically capable* of maritime transportation, not whether it is "in navigation" or whether its "primary purpose" is to transport goods or people on water. *See, e.g, Holmes v. Atlantic Sounding Co.*, 437 F.3d 441 (5th Cir. 2006) (recognizing *Stewart's* expansion of the term "vessel" and "hav[ing] no trouble" concluding that a floating dormitory was a vessel even though its primary purpose was not to transport goods or persons). Additionally, the opinion in *Roper II* is not directly applicable here as such opinion did not address the jurisdictional status of the ship, but instead whether the ship was "in navigation" for the purposes of the warranty of seaworthiness. *Roper II,* 368 U.S. at 22-23; *see also Roper,* 282 F.2d at 417 (framing the question as whether the vessel owner warranted the condition of certain equipment and finding that no warranty exists when "the vessel clearly represented itself as being entirely without operable equipment and usable gear").

21

reasonably fit for its *intended purpose*." T. Schoenbaum, Admiralty and Maritime Law § 3.9 (3d ed. 2001) (emphasis added); *see Belle of Orleans*, 535 F.3d. at 1311-12 (explaining that *Stewart* teaches that a ship owner's intent is irrelevant to the jurisdictional calculus of whether a ship is a "vessel"). Although this Court and the Ninth Circuit reach the opposite result regarding vessel status in the context of a repair contract, the Ninth Circuit nevertheless acknowledged that "the persuasiveness of [*West* and similar cases] is limited because they analyzed whether the vessels were seaworthy not whether they were dead ships for jurisdictional purposes" and the "questions of jurisdiction and seaworthiness are largely distinct . . . ." *Robert E. Blake*, 104 F.3d at 1161. Because a warranty of seaworthiness is implied when a ship is being used in navigation, such warranty may not survive even a temporary withdrawal from navigation for major repairs because the withdrawal from navigation signals the termination of the implied warranty. *See West*, 361 U.S. at 122 (acknowledging that it "would be an unfair contradiction to say that the owner held the vessel out as seaworthy" *while it was undergoing repairs to make it seaworthy*). In contrast, *Stewart* teaches that whether a ship is deemed a "vessel" turns not on an owner's representations or warranties, the ship's current state of transit, or the ship's primary purpose. The seaworthiness cases are therefore inapposite and offer little guidance to this Court when conducting the jurisdictional inquiry mandated by *Stewart*.[15]

---

[15] In the alternative, even if this Court read the seaworthiness cases as implicating the jurisdictional standard applicable at the time such cases were decided, the Court would still conclude that the Vandenberg is a vessel under the current jurisdictional standard as *Stewart* expressly holds that vessel status no longer turns on whether a ship is "in" or "out of" navigation. Under the framework established in *Stewart*, it plainly remains *relevant* whether the Vandenberg was "withdrawn from navigation," but even if it was, its status does not turn on such fact alone as this Court is required to consider, in "all cases," whether a ship's use as "a means of transportation on water is a practical possibility or merely a theoretical one." *Stewart*, 543 U.S. at 496; *cf. Noel*, 287 F.2d at 785 (finding that the ship was a "dead ship" merely because it "was

22

### G. Self-Propulsion

Key West and BB&T suggest in their briefs that the Vandenberg is not a vessel due to its inability to operate under its own power.  However, as discussed at length above, a vessel is defined as any watercraft practically capable of transportation of goods or persons on water.  The fact that a barge, dredge, or damaged vessel cannot operate under its own power and must be towed does not make such watercraft any less of a "vessel" for jurisdictional purposes, as it still may be used to transport goods or persons on water under tow.  *United States v. Templeton*, 378 F.3d 845, 852 (8th Cir. 2004).  In *Templeton*, the Eighth Circuit held that inoperable engines were insufficient to destroy the vessel status of a former tow barge that was transformed into a floating restaurant.  The court explained that the watercraft was "'capable of use' as a vessel, albeit under tow," and that "while it may have been inefficient or expensive to use the [ship] as a vessel, those factors do not serve to strip the [ship] of its vessel status." *Id.; see also Stewart*, 543 U.S. at 484 (finding a large dredge to be a vessel even though it had "only limited means of self-propulsion," navigating short distances by manipulating its cables and anchors and requiring a tugboat to move it longer distances).

Similarly, in *Miami River Boat Yard, Inc. v. 60' Houseboat*, 390 F.2d 597 (5th Cir. 1968), the Fifth Circuit held that a houseboat is a place to live "with the added advantage of at least some maritime mobility" and that even if such watercraft "has no motive power and must, as

---

no longer in service").  Here, regardless of whether the Vandenberg was out of navigation at the time the subcontract was signed, the contracts between Key West and Artificial Reefs of the Keys, Artificial Reefs of the Keys and Reefmakers, and Reefmakers and Colonna's, along with Vandenberg's transportation to the shipyard from the fleet, conclusively answer the dispositive jurisdictional question and establish the practicality of the forthcoming use of the Vandenberg as a means of transportation on water.

would the most lowly of dumb barges, be towed does not deprive her of the status of a vessel."
*Id.* at 597. The Eighth and Fifth Circuit opinions cited above are consistent with holdings in
numerous other federal cases. *See, e.g., McCarthy v. The Bark Peking,* 716 F.2d 130, 135 (2d
Cir. 1983) (indicating that to retain its vessel status a ship need only retain its "residual capacity"
and concluding that the watercraft in question, a museum ship, was "capable of being towed,
welded rudder notwithstanding" and was therefore a vessel); *Pleason v. Gulfport Shipbuilding
Corp.,* 221 F.2d 621, 623 (5th Cir. 1955) (finding that the ship in question was "an artificial
contrivance capable of being used as a means of water transportation" as: (1) "It was afloat"; (2)
"Before repairs, it was towed across the Gulf of Mexico"; (3) "[A]fter repairs, it was towed from
Port Arthur to Port Isabel, Texas"; and (4) "It had a deck; it had cabins, it had superstructure" and
although it lacked any power or steering mechanism "it definitely was capable of being used as a
means of transportation under tow"); *Hercules,* 214 F.2d at 69 (finding a ship to be a vessel even
though she was "unable to navigate under her own power" as the ship was navigable "at least to
the extent that she could be towed"); *Advance Welding,* 299 F. Supp. at 738 (indicating that
severe damage to a ship which caused an insurance underwriter to declare it a total loss did not
take the vessel outside of the court's maritime jurisdiction; the fact that the ship was towed to a
shipyard after the accident proved that it remained a vessel); *Luna v. Star of India,* 356 F. Supp.
59, 66 (S.D. Cal. 1973) (indicating that under the broad definition of vessel contained in 1 U.S.C.
§ 3, a moored historic ship being used as a museum was a vessel as if the ship "slipped from her
moorings, whether deliberately or by chance, she would undoubtedly be capable of engaging in
maritime transportation, if only as a towed craft"); *Hudson Harbor 79th St. Boat Basin, Inc. v.
Sea Casa,* 469 F. Supp. 987, 989 (S.D.N.Y. 1979) ("[I]t is clear that a floating houseboat capable

of being towed from one location to another is a vessel within the admiralty and maritime jurisdiction of this Court."); *The Showboat*, 47 F.2d 286, 287 (D. Mass. 1930) (finding that a five-masted schooner being used as a restaurant and dance hall whose "mooring lines and chains can be readily cast off and the electric wires are so fitted as to be easily detachable" remains a vessel as it could either move by sail or "could be towed as she now is anywhere that a barge can be taken"). Accordingly, the Vandenberg is no less a vessel because it will be towed to Florida rather than operate under its own propulsion.

### H. Summary

As set forth in detail above, the Court concludes that the Vandenberg is a "vessel" within the Court's admiralty and maritime jurisdiction. Therefore, this Court has jurisdiction over the maritime contract and *in rem* claims since the subcontract at issue is properly classified as a "vessel" repair contract. Because the Court determines that jurisdiction is appropriate on such ground, it need not address Colonna's alternative arguments purporting to establish maritime jurisdiction. Accordingly, Key West's and BB&T's motions to dissolve the arrest of the Vandenberg and dismiss the *in rem* claims are **DENIED**.

### IV. Discussion – Motion for Interlocutory Sale

Colonna's filed the instant Motion for Interlocutory Sale of the Vessel on June 11, 2008, more than two months after the Vandenberg was arrested, as neither Reefmakers nor Key West posted security following the ship's arrest. In conjunction with its motion, Colonna's submitted an affidavit executed by Plaintiff's counsel asserting that the Vandenberg is a wasting asset, that storage costs are significant and continually mounting, and that Reefmakers and/or Key West

have unreasonably delayed in seeking release of the vessel.  Several months later at oral

argument, Colonna's represented to the Court that, during the *more than six months* that had then

passed since the Vandenberg was arrested, storage costs had reached several hundred thousand

dollars.  Furthermore, as reflected in the agreed order entered July 2, 2008, the running total of

storage costs continues to increase $1,250 for each additional day that the Vandenberg is stored

at Colonna's.  Notwithstanding the lengthy arrest period and mounting storage costs, no original

party, intervening party, or claimant has filed a brief in opposition to Colonna's motion seeking

entry of an order permitting the interlocutory sale of the Vandenberg.[16]  At oral argument,

although all present were afforded the opportunity to comment on Colonna's motion, there was

little said in opposition to a court-ordered sale of the vessel.

　　　Rule E(9) of the Supplemental Maritime Rules states:

**(9) Disposition of Property; Sales.**
　**(a) Interlocutory Sales; Delivery.**
　　(i) On application of a party, the marshal, or other person having custody of the
　　　property, the court may order all or part of the property sold–with the sales
　　　proceeds, or as much of them as will satisfy the judgment, paid into court to
　　　await further orders of the court–if:
　　　(A) the attached or arrested property is perishable, or liable to deterioration,
　　　　　decay, or injury by being detained in custody pending the action;
　　　(B) the expense of keeping the property is excessive or disproportionate; or
　　　(C) there is an unreasonable delay in securing release of the property.

　　(ii) In the circumstances described in Rule E(9)(a)(i), the court, on motion by a
　　　defendant or a person filing a statement of interest or right under Rule C(6),
　　　may order that the property, rather than being sold, be delivered to the
　　　movant upon giving security under these rules.

---

[16] The only filings which could be construed as opposing such motion are the claimants'
motions to dissolve the arrest of the Vandenberg.  However, no motions or briefs were filed to
oppose the interlocutory sale in the event that the Court determined that it had jurisdiction over
the Vandenberg.

**(b) Sales, Proceeds.** All sales of property shall be made by the marshal or a deputy marshal, or by other person or organization having the warrant, or by any other person assigned by the court where the marshal or other person or organization having the warrant is a party in interest; and the proceeds of sale shall be forthwith paid into the registry of the court to be disposed of according to law.

Fed. R. Civ. P. Supp. R. Admiralty & Maritime Claims E(9). After careful consideration of Colonna's unopposed motion, the Court **GRANTS** Colonna's motion for entry of an order permitting the interlocutory sale of the Vandenberg. As significant storage costs have accumulated during the six-and-a-half months since the Vandenberg was arrested and no effort has been made to secure its release, and considering the relative value of the Vandenberg, the Court finds that Colonna's has provided sufficient evidence to establish both that storage costs have become excessive and that there has been an unreasonable delay in securing the vessel's release. *See Silver Star Enters., Inc. v. M/V Saramacca*, 19 F.3d 1008, 1014-15 (5th Cir. 1994) (finding that the "excessive expense of keeping the vessel under seizure" and the "unreasonable" seven month delay between the time of arrest and the date of the court's sale order both "constitute valid and independent grounds for an interlocutory sale").

Colonna's attached a proposed "Order for Interlocutory Sale Rule E(9)" with its motion seeking an interlocutory sale of the Vandenberg. However, Colonna's acknowledged at oral argument that such order needed revisions as it improperly indicates that the Marshal is still in custody of the Vandenberg. As set forth below, the Court affords Colonna's seven days from the date of this order to submit for entry a substitute order correcting such misstatements.

## V. Conclusion

For the reasons set forth more fully above, the Court **DENIES** the motions filed by Key West and BB&T to dissolve the arrest of and dismiss the *in rem* claims against the Vandenberg because the Court finds that the Vandenberg is a vessel practically capable of maritime transportation.

The Court **GRANTS** Plaintiff's motion seeking entry of an order permitting the interlocutory sale of the Vandenberg as storage costs have become excessive and there has been an unreasonable delay in securing release of the vessel. However, the Order permitting such sale and setting forth the conditions for such sale will be subsequently entered following submission of a corrected order by Colonna's. Accordingly, Colonna's is **AFFORDED seven (7) days** from the date of this order to submit a substitute order correcting any misstatement regarding the custodian of the vessel. The substitute Order for Interlocutory Sale to be submitted by Plaintiff should also be modified to reflect that the Vandenberg is to be sold on **thirty (30) days** public notice.

The Clerk is **DIRECTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

/s/ _____

Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
October **27** , 2008

28